UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:21-CV-00138-GNS-HBB

JESSICA CHILDERS                                                    PLAINTIFF

v.

CASEY COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION;
BARRY LEE; and
DARAN WALL                                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 18) and Plaintiff's Motion for Partial Summary Judgment (DN 19). The motions are ripe for decision. For the outlined reasons, Defendants' motion is **GRANTED**, and Plaintiff's motion is **DENIED**.

## I.     SUMMARY OF THE FACTS

Plaintiff Jessica Childers ("Childers") was a special education teacher at Jones Park Elementary School ("Jones Park") in Casey County, Kentucky. (Am. Compl. ¶¶ 1, 12, DN 13). Childers gave birth prior to the 2020-2021 school year and required a suitable time and place to express breast milk. (Am. Compl. ¶ 14). Childers requested this accommodation from Defendants Casey County School District Board of Education ("BECC");[1] Barry Lee ("Lee"), BECC's Director of Special Education at the time; and Daran Wall ("Wall"),[2] the principal of Jones Park (collectively "Defendants"). (Am. Compl. ¶¶ 2, 6-7, 15).

---

[1] The Amended Complaint names "Casey County School District Board of Education" as a defendant, but BECC explains that its proper title is "Board of Education of Casey County, Kentucky." (Am. Compl.; Answer 1 n.1, DN 14).

[2] The Amended Complaint identifies Wall as "Daran" but also refers to him as "Daron" and "Darion." (Am. Compl. ¶¶ 7, 15(a)). The Answer refers to Wall as "Daran." (Answer 1).

Childers expressed milk during personal breaks while in her classroom but claims that Defendants curtailed her accommodation by, *inter alia*, subjecting her to pejorative comments during a staff meeting about the time to express milk, reducing Childers' breaks to pump and plan classes, directing Childers to remove a window cover from the door to her classroom, and intruding into Childers' classroom while she was pumping.  (Am. Compl. ¶ 15).  Wall ultimately gave Childers a negative performance evaluation, and her contract was terminated.  (Am. Compl. ¶ 15).

Childers initiated this action under Title IX of the Education Amendments Act of 1972 ("Title IX"),[3] 20 U.S.C. § 1681, and the Kentucky Civil Rights Act ("KCRA"), KRS 344.040, alleging claims of discrimination, retaliation, hostile work environment, gross negligence, and outrageous conduct.[4]  (Am. Compl. ¶¶ 4, 25-35).  The parties have filed cross-motions for summary judgment, but Childers' motion is limited to liability.  (Defs.' Mot. Summ. J., DN 18; Pl.'s Mot. Partial Summ. J., DN 19).

## II.   **JURISDICTION**

The Court exercises subject-matter jurisdiction over this matter based upon federal question jurisdiction.  *See* 28 U.S.C. § 1331.

---

[3] Childers asserts her claims under Title IX but does not specify to which claims it applies.  (Am. Compl. ¶¶ 4, 25-35; *cf.* Am. Compl. ¶¶ 27, 29 (referencing KRS 344.040 and 344.280)).  Childers' motion addresses Title IX only for the claims of discrimination, retaliation, and hostile work environment.  (Pl.'s Mem. Supp. Mot. Partial Summ. J. 5-10, DN 19-1 [hereinafter Pl.'s Mem.]).  Accordingly, those claims are evaluated under Title IX.  *See Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 550 (7th Cir. 2022) ("We do not punish a plaintiff for not invoking specific statutes [in the complaint]; what matters is the plaintiff's factual allegations.").  Childers' claims for gross negligence and outrageous conduct, however, shall be addressed only under Kentucky law.  *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 685-86, 704-05 (M.D. Tenn. 2018) (addressing similar claims in a Title IX action under state law).

[4] Childers does not enumerate each claim but emphasizes sections regarding respondeat superior and punitive damages.  (Am. Compl. ¶¶ 23-24, 30-31).  To the extent these are independently asserted, they fail as a matter of law because they are not causes of action.  *See Vonderhaar v. AT&T Mobility Servs., LLC*, 372 F. Supp. 3d 497, 516 (E.D. Ky. 2019); *Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp. 3d 889, 896 n.3 (W.D. Ky. 2017).

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this lack of material fact is established, the burden then shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, "is not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). If the record taken as a whole could not support a finding of fact in favor of the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard operates likewise with cross-motions for summary judgment. *See Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016). Accordingly, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (citation omitted).

### IV.   <u>DISCUSSION</u>

#### A.   <u>Title IX and KCRA Claims</u>

Title IX instructs that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Title VII of the Civil Rights Act of 1964 ("Title VII") similarly prohibits discrimination against an individual because of their sex, which also includes pregnancy-related conditions.  42 U.S.C. §§ 2000e(k), 2000e-2(a)(1).  Accordingly, claims under Title VII and Title IX are evaluated using analogous standards.  *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023) (citing *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020)).  Relatedly, the KCRA prohibits the failure to make reasonable accommodations[5] for an employee's pregnancy-related limitations, including the need to express breast milk.  KRS 344.040(1)(c).  Considering "the substantial similarity of the respective texts and objectives, [Kentucky courts] interpret the civil rights provisions of [the KCRA], in both the discrimination and retaliation contexts, consistent with the analogous federal anti-discrimination statutes."  *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 575 (Ky. 2016) (citing *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005)); *cf. Spees v. James Marine, Inc.*, 617 F.3d 380, 389 (6th Cir. 2010) ("[T]he KCRA is 'similar to Title VII . . . and should be interpreted consistently with federal law."  (quoting *Ammerman v. Bd. of Educ. of Nicholas Cnty.*, 30 S.W.3d 793, 797-98 (Ky. 2000))).

For Childers to prevail on her Title IX claims, she must establish a prima facie case as to each of her claims for discrimination, retaliation, and hostile work environment.[6]  *See Michael v.*

---

[5] For pregnancy, childbirth, or related medical conditions, a "reasonable accommodation" includes "more frequent or longer breaks, . . . modified work schedule, and private space that is not a bathroom for expressing breast milk . . . ."  KRS 344.030(6)(b).  A "related medical condition" includes "lactation or the need to express breast milk for a nursing child . . . ."  KRS 344.030(8)(b).

[6] In Title IX actions, an individual employee or supervisor cannot be held personally liable for any alleged violations.  *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 881 (W.D. Ky. 2011) (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999); *Soper ex rel. Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)); *accord Bose*, 947 F.3d at 989 ("[T]here is no individual liability under Title IX, so [a plaintiff] cannot use Title IX to sue [an individual defendant] directly for his alleged retaliatory act."  (citation omitted)); *cf. Davis*, 526 U.S. at 641 ("The Government's enforcement power may only be exercised against the funding recipient, and

4

*Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) ("[The plaintiff] bears the initial burden under that framework of demonstrating the prima facie elements of her Title VII claim." (citation omitted)).  These showings are made "either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of facts which create an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995) (internal citations omitted) (citation omitted); *accord Goldblum*, 62 F.4th at 251; *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted).  When only circumstantial evidence exists, the claim is assessed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013); *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006).

---

we have not extended damages liability under Title IX to parties outside the scope of this power." (internal citation omitted) (citation omitted)).  Instead, "[a] Title IX claim may be brought only against the funding recipient." *Condiff*, 770 F. Supp. 2d at 881 (citing *Soper*, 195 F.3d at 854). Accordingly, summary judgment must be granted in favor of Lee and Wall on these claims. Moreover, considering the KCRA is interpreted consistent to its federal counterparts, this extends equally to Childers' state-law claims for discrimination and hostile work environment.  *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).  The KCRA "permits the imposition of liability on individuals" for claims of retaliation, however, so Childers' state-law retaliation claim against Lee and Wall will not be dismissed on this basis.  *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 630 (6th Cir. 2013) (internal quotation marks omitted) (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793-94 (6th Cir. 2000)); *cf. Morris*, 201 F.3d at 793 (explaining that the KCRA prohibits retaliation by "a person," while Title VII prohibits retaliation by "an employer."  (quoting KRS 344.280; 42 U.S.C. § 2000e-3(a))).  As this is "[t]he only meaningful distinction between these provisions," the KCRA retaliation claims against Lee and Wall are evaluated under the same framework as the claims against BECC.  *Stevens*, 533 F. App'x at 630; *see also Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004).

Childers argues that Defendants' purported demands to remove her door covering and shorten her personal breaks constitutes direct evidence of discrimination. (Pl.'s Mem. 7). These actions require the Court to draw inferences as to whether they reflect a bias against women with pregnancy-related conditions, however, and whether this purported bias prompted her termination. *See Hunter v. Gen. Motors LLC*, 807 F. App'x 540, 543 (6th Cir. 2020). Therefore, Childers does not present direct evidence, and her claims are assessed under the burden-shifting framework.

### 1.   *Discrimination and Retaliation*

To establish a prima facie case of discrimination, Childers must show that she: (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position, and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)); *cf. Turner v. Sullivan Univ. Sys., Inc.*, 420 F. Supp. 2d 773, 785 (W.D. Ky. 2006) ("To prevail on a pregnancy discrimination claim, [a plaintiff] must establish that . . . (4) there was a nexus between her pregnancy and the adverse employment action." (citing *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002))). Childers demonstrates a prima facie case of retaliation if: (1) she was engaged in a protected activity, (2) Defendants knew about the protected activity, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse action. *Goldblum*, 62 F.4th at 251 (quoting *Bose*, 947 F.3d at 988-89). If Childers meets her initial burden to prove a prima facie case, the burden then shifts to Defendants to state a legitimate, non-discriminatory, and non-retaliatory reason for Childers' termination. *See McDonnell Douglas Corp.*, 411 U.S. at 802.

The parties do not dispute that Childers had a pregnancy-related condition and was thus part of a protected class, her accommodations were a protected activity, and Defendants knew of this condition.  (*See* Childers Dep. 53:10-19, 55:3-6, Aug. 26, 2022, DN 18-2; Defs.' Mot. Summ. J. Ex. B, at 7-8, DN 18-3; Defs.' Mot. Summ. J. Ex. C, at 7, DN 18-4; Pl.'s Mot. Partial Summ. J. Ex. 6, DN 19-8); KRS 344.030, 344.040(1)(c); 29 U.S.C. § 218d(a);[7] 42 U.S.C. § 2000e(k).

Regardless, "once a defendant 'responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection,' whether or not the plaintiff made out a prima facie case 'is no longer relevant.'"  *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 1999) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983)).  This response instead "move[s] the inquiry to the ultimate factual question of whether its action against the plaintiff was discriminatory or not . . . . [and] a district court cannot resolve the case by returning to the prima facie stage."  *Id.* (citing *U.S. Postal Serv. Bd. of Governors*, 460 U.S. at 717; *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860-63 (6th Cir. 1997)).  Defendants dispute that a nexus exists between Childers' accommodations and her non-renewal and termination; rather, they maintain that Childers was terminated due to poor work performance and a lack of tenure.  (Defs.' Mem. Supp. Mot. Summ. J. 8-9, DN 18-1 [hereinafter Defs.' Mem.]); *see White v. Coventry Health & Life Ins. Co.*, 680 F. App'x 410, 414-15 (6th Cir. 2017) ("An employer discriminates against an employee when it adversely changes the terms or conditions of employment because an employee is a member of a protected group."  (citation omitted)); *accord Cline*, 206 F.3d at 658 (requiring

---

[7] The parties reference Section 207(r) of the Fair Labor Standards Act requiring employers to provide a reasonable break time and location, other than a bathroom, for an employee to express milk.  *See* 29 U.S.C. § 207 note to 2022 amendment.  Congress has since stricken Subsection (r) from Section 207 and has incorporated its provisions into a new statute concerning breastfeeding accommodations in the workplace.  *See* 29 U.S.C. § 218d(a); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. KK, § 102(a), 136 Stat. 4459, 6093-95.

that "a nexus between her pregnancy and the adverse employment decision." (citation omitted)). Therefore, the inquiry turns to whether Defendants have presented a legitimate, non-discriminatory, and non-retaliatory basis for the termination. *See Cline*, 206 F.3d at 661; *McDonnell Douglas Corp.*, 411 U.S. at 802.

Childers concedes that she was not a tenured employee, her contract was only for the 2020-2021 school year, and she was subject to termination. (Childers Dep. 123:22-24, 125:4-12). As for her evaluation, Childers' performance during the 2020-2021 school year was assessed across four measures: (1) planning, (2) environment; (3) her instruction and delivery; and (4) professionalism. (Pl.'s Mot. Partial Summ. J. Ex. 4, at 1, DN 19-6 [hereinafter Jones Park Eval.]). The process included in-class observations and submitting a binder to Wall documenting Childers' performance and how she achieved the goals outlined by the four measures. (Childers Dep. 119:17-120:8). Childers noted that Wall offered guidelines about which documents to submit, but the final decision of which to submit was up to the teacher. (Childers Dep. 120:4-121:17). Wall concluded that Childers' performance merited an "accomplished" rating for measure 2; a "developing" rating for measures 1, 3, and 4; and an overall rating of "developing." (Jones Park Eval. 1).

Childers disagreed with this assessment and attached two pages of comments disputing Wall's conclusions, including disagreement about the quality of documents provided, limitations in submittable documents due to virtual learning and the COVID-19 pandemic, a lack of inter-student communication, and limited examples of helping students after school because of Childers' assigned bus and hallway duties. (Jones Park Eval. 1-3; Childers Dep. 104:16-121:23). Childers maintains that she deserved an "accomplished" rating overall and on each measure. (Jones Park Eval. 1-3; Childers Dep. 108:3-4). Childers contested Wall's evaluation to the local school

district's evaluation appeals committee, consisting of two teachers and an administrator.[8] (Childers Dep. 121:24-25, 122:15-22).  Childers presented her objections to the evaluation and explained why she deserved an "accomplished" rating, but the committee ultimately upheld Wall's evaluation and dismissed Childers' appeal.  (Childers Dep. 121:24-122:14, 123:17-21).

Defendants contend that Childers' duties as a special education teacher required her to attend Admissions and Release Committee ("ARC") meetings to develop an individualized education program ("IEP"), to evaluate her students, and ensure that each special education student is included in the school's December 1 Child Count ("Count").  (Defs.' Mem. 9).  After returning from maternity leave, Defendants maintain that Childers attended two ARC meetings regarding a student but then failed to submit timely the proper documents to ensure that the student was included in the school's Count, which resulted in the loss of some federal funding.  (Defs.' Mem. 9).  Childers notes that the child was out of compliance with the school's Count before she returned from maternity leave, but acknowledges that she attended two ARC meetings for this child and attempted to include the child in the Count.  (Childers Dep. 81:6-82:14).  After these meetings, Childers believed she did not have to complete the verification forms to include the child on the Count, but later learned that she was supposed to submit the documents.  (Childers Dep. 83:11-22).  Childers ultimately submitted the forms but concedes that "[a]ccording to Barry Lee, it was

---

[8] Childers claims the appeals committee was "incredibly biased" against her, as the two teachers on the panel were purportedly siblings and one of them also taught at Jones Park and reported to Wall.  (Childers Dep. 122:23-123:8).  Childers commented that the member from Jones Park "should have recused themselves and another [person] from a different school should have taken her place[,]" but nothing in the record shows that Childers presented this claimed conflict to the committee or sought the member's recusal.  (Childers Dep. 123:3-5).  Moreover, Childers does not detail any action by the panel to otherwise evidence a bias against her, nor is there any indication that Wall exerted any improper influence on the committee's determination.  *See* KRS 156.557(8) (requiring that the evaluation appeals panel be comprised of two members elected by local school district employees and one member appointed by the local board of education).

not in a timely enough manner," so the child was not included in the Count.  (Childers Dep. 83:23-84:8).

Accordingly, Defendants have provided a legitimate, non-discriminatory, and non-retaliatory basis for Childers' non-renewal and termination that do not show a nexus between Childers' accommodations and her termination.  Accordingly, the burden then shifts back to Childers to demonstrate that Defendants' reasons were pretextual, which may be shown "by establishing one of three things:  '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that [the proffered reasons] were insufficient to motivate the employer's action.'"  *Goldblum*, 62 F.4th at 252 (alteration in original) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Childers posits that her termination was pretextual considering her lack of employment issues at her prior school and her list of objections to Wall's evaluation.  (Pl.'s Resp. Defs.' Mot. Summ. J. 7-8, DN 24; Pl.'s Mem. 10).  Prior to working at Jones Park, Childers taught at Liberty Elementary School from 2017 through 2020, where her performance was similarly evaluated at the conclusion of each school year.  (Pl.'s Mem. 1; Pl.'s Mot. Partial Summ. J. Ex. 3, DN 19-5 [hereinafter Liberty Evals.]).  Childers' evaluations from the 2018-2019 and 2019-2020 school years denote "developing" ratings for measures 1 and 3, "accomplished" ratings for measures 2 and 4, and an overall rating of "accomplished." (Liberty Evals. 2-3).  Childers' evaluation from the 2017-2018 school year utilized a different rating system and instead offered a grading scale across four comparable measures—(1) planning and preparation; (2) classroom environment; (3) instruction; and (4) professional responsibilities—to produce an overall grade, and Childers received an "A" on all four measures. (Liberty Evals. 1).  Notably, the Liberty Elementary School administrator only assessed measures 2 and 3; Childers self-evaluated her performance on

10

measures 1 and 4.  (Childers Dep. 119:4-7).  Evaluations at Jones Park, in contrast, had Wall assessing all four measures.  (Childers Dep. 119:7-8).  When comparing Wall's evaluation with the ones conducted in 2019 and 2020, his conclusions are consistent with the administrator's determination of measure 3, which Childers did not dispute, and Childers' self-assessment of measure 1.  (*Compare* Liberty Evals. 2-3, *with* Jones Park Eval. 1).  Therefore, Childers has not demonstrated that Wall's evaluation was pretextual, because she fails to show that it was factually baseless, not the actual motivation for her non-renewal, or insufficient to motivate Defendants not to renew her contract, especially considering Childers' objections were rejected by the appeals committee.

Childers also contends that the child missing from the Count cannot be solely attributed against her, so Defendants' reliance on that incident was pretextual.  (Pl.'s Resp. Defs.' Mot. Summ. J. 7-8).  Childers argues that she was the one who discovered this error, as the child was enrolled while she was on maternity leave, and she was not notified about being responsible for the verification documents until Childers was in quarantine for exposure to COVID-19.  (Pl.'s Mem. 10; Pl.'s Resp. Defs.' Mot. Summ. J. 7-8 (citing Childers Dep. 83:2-86:15)).  Even accepting these assertions, Childers has not shown that Defendants' reliance on this incident was insufficient to motivate or the actual motivation for her non-renewal, nor does she demonstrate that Defendants' reliance was factually baseless.  Childers concedes that she was responsible for submitting the documents and did so untimely, despite mistakenly believing that the submission was another person's responsibility.  (*See* Childers Dep. 83:14-84:16).

Therefore, Defendants have established a legitimate basis for Childers' non-renewal and termination, which did not discriminate or retaliate against her for her protected activity, and Childers has not established that Defendants' proffered basis was pretextual.  *See McDonnell*

*Douglas Corp.*, 411 U.S. at 802; *Goldblum*, 62 F.4th at 252; *Cline*, 206 F.3d at 661.  Accordingly, Defendants' motion for summary judgment is granted on the discrimination and retaliation claims against BECC and the retaliation claims against Lee and Wall.  Childers' motion for partial summary judgment will be denied as to these claims.

### 2. *Hostile Work Environment*

To establish a claim for hostile work environment due to sexual harassment, a plaintiff must demonstrate:  "(1) the employee was a member of a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability."[9]  *Vickers*, 453 F.3d at 762 (citing *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)).  "Discrimination in this form occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Williams*, 187 F.3d at 560 (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) ("The conduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" (citation omitted)).  Courts evaluating whether the environment is objectively severe or pervasive "consider a nonexhaustive list of factors, including 'the frequency of the discriminatory conduct; its severity;

---

[9] Defendants contend that *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), requires dismissal of the claims, as Childers fails to identify a policy or custom which was the basis for the alleged actions.  (Defs.' Mem. 11-12).  This assertion is unfounded, as *Monell* clearly holds that "a local government may not be sued *under* [*42 U.S.C.*] *§ 1983* for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694 (emphasis added).  Childers has never alleged, cited, or referenced Section 1983 as a basis for her claims.

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Wyatt*, 999 F.3d at 411 (quoting *Harris*, 510 U.S. at 23); *cf. id.* ("We are more likely to conclude that conduct is pervasive when the sexually harassing conduct is continuous and not sporadic." (citation omitted)).

The parties primarily disagree regarding the fourth prong of the analysis:  creation of a hostile work environment.  Defendants deny that Lee made the comments alleged in the Amended Complaint, but even accepting the allegations as true, Lee's conduct "could be construed as mildly offensive . . . [but] not severe, pervasive, or substantial enough to satisfy the prima facie showing." (Defs.' Mem. 6-7).  Moreover, Defendants contend that this alleged conduct should be considered isolated incidents rather than ongoing and pervasive.  (Defs.' Mem. 7).  Childers asserts that Lee's demands to shorten her personal and planning sessions was continuing and ongoing and more severe than mere offensive utterances.  (Pl.'s Resp. Defs.' Mot. Summ. J. 4-5).

Childers returned from maternity leave to Jones Park at the beginning of October of 2020. (Childers Dep. 18:6-11).  On October 7, Lee met with Jones Park's special education department to discuss class schedules and caseloads and reviewed a draft schedule from each teacher. (Childers Dep. 18:6-11, 72:5-73:4).  Lee reviewed Childers' schedule and asked about the purpose of her personal breaks.  (Childers Dep. 73:23-74:5).  After explaining that it was her scheduled time to express milk, Childers contends that Lee "got very loud," "very angry, and he smacked the paper on the table," and said that her schedule "wasn't going to work" because "[t]here's no way he's going to pay [Childers] to see kids and—he's not going to pay [Childers] to do nothing." (Childers Dep. 74:11-15).  Defendants deny that the outburst occurred; Lee maintains that he learned of Childers' accommodation from her response to his question and did not provide any further discussion about the topic.  (Defs.' Mot. Summ. J. Ex. C, at 8-9).  Lee avers that he and

Wall spoke with Childers privately after the meeting about their concern that she had a "large amount of time (2.5 hours per day) on her daily schedule that she was not with students" and emphasized "the need to maximize instructional time with students . . . ." (Defs.' Mot. Summ. J. Ex. C, at 8-9; *accord* Defs.' Mot. Summ. J. Ex. B, at 9-10).

The following day, on October 8, Lee, Wall, Childers, and another person from the school district met regarding Childers' schedule. (Childers Dep. 41:4-8). Childers contends that Lee unilaterally limited her pumping sessions to twenty minutes, which he considered a reasonable accommodation time based on information from other people. (Childers Dep. 41:16-22). Childers was further told she would only have thirty minutes for planning to compensate for the extended times without students. (Childers Dep. 42:10-18). Lee insists that the meeting only inquired whether Childers' planning period could be divided into two separate sessions, while still allowing the same cumulative time, and to discuss the possibility of reducing her personal time to express milk to twenty minutes if Childers felt that was enough time. (Defs.' Mot. Summ. J. Ex. C, at 9).

Notably, Childers never reduced her personal break times, despite these alleged demands. (Childers Dep. 39:2-6, 45:17-19, 46:10-12, 47:7-25, 51:18-25). Lee acknowledges that he asked Childers to reduce her planning time to forty-five minutes, which he "mistakenly believed" was afforded to all teachers, but Childers instead changed her schedule to reflect the proper fifty-five-minute session. (Defs.' Mot. Summ. J. Ex. C, at 12-13). Childers did not further reduce this time. (Childers Dep. 45:17-19). Childers concedes she never discussed any concerns about the duration of her scheduled personal time with Defendants, nor did she discuss any such issues with anyone else in the school district, as she never reduced her scheduled times. (Childers Dep. 47:7-25). To the extent Childers contends she was improperly required to submit a doctor's statement regarding milk expression time, her testimony demonstrates that she voluntarily obtained the statement and

then notified Lee and Wall of the statement, so her objection to their supposed request to produce a note from her physician is not well taken.  (Childers Dep. 54:21-56:9).

Childers also argues that Wall "specifically target[ed] her to remove her window covering . . . ."  (Pl.'s Resp. Defs.' Mot. Summ. J. 4).  In January 2021, Wall sent an email to all staff members about window covers on the doors to classrooms.  (Childers Dep. 59:19-21).  The email relayed new district-wide policies following safety audits and noted that "doors do not need to be covered," as the school district was "purchasing some window covers that will be uniform throughout the district."  (Childers Dep. 57:3-58:4; *accord* Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 4, DN 24-4).  When discussing her interaction with Wall the following week, Childers recounted Wall conveying the same message as the email.  (Childers Dep. 63:20-22).  Childers further acknowledged that "[Wall] did not say [the window covers] must be removed immediately.  He just said [the windows] did not need to be covered."  (Childers Dep. 63:20-22; *see also* Defs.' Mot. Summ. J. Ex. B, at 11).  Even then, Childers continued to cover her windows while expressing milk and was not punished.  (Childers Dep. 60:13-61:5).  Therefore, these comments alone do not establish any purported targeting and the overall conduct does not rise to the level of an abusive working environment.

Finally, Childers claims that she was intruded upon while expressing milk.  (Childers Dep. 65:17-66:7; 100:10-15).  Childers' present motion does not discuss an alleged intrusion by a custodian, but she acknowledges that two custodians' intrusions on the same day were not purposeful or intended to humiliate her.[10]  (Childers Dep. 67:24-68:9; *see* Pl.'s Mot. Partial Summ.

---

[10] When preparing to pump breast milk, Childers testified that she would not post any indication that someone was in the classroom or not to enter the room.  (Childers Dep. 66:17-67:14).  She would lock the door and turn the lights off to give the appearance that no one was inside.  (Childers Dep. 66:17-67:14).

J. Ex. 7, at 12, DN 19-9).  The last instance purportedly involved Wall entering Childers' classroom during her scheduled time to express milk.  (Childers Dep. 100:13-101:5).  Wall maintains that he did not enter Childers' classroom during her personal time and instead delivered her pre-observation documents before the scheduled time.  (Defs.' Mot. Summ. J. Ex. B, at 12).  Despite these alleged events, Childers did not request a new location and believed that the room was otherwise private and sufficient for her accommodation.  (Childers Dep. 96:2-98:7, 101:6-8; *see also* Defs.' Mot. Summ. J. Ex. B, at 12 ("[Childers] designed and followed her own daily schedule and never came to me [Wall] expressing any concerns regarding her alleged need for additional time or accommodations related to the expression of breastmilk.")).

Ultimately, Childers agreed that she was afforded a private location to express breast milk during the day; she thought her classroom was a sufficient location; she was provided two separate personal breaks during the day to pump in addition to a planning period and lunch; she utilized the full thirty-minute personal break to pump despite allegations of directives to shorten that time; Childers was not singled out regarding the window covers on the doors; she continued to cover her windows while expressing milk without punishment; and her planning time was reduced only to the same duration as other teachers.  (Childers Dep. 52:17-53:19, 57:3-23, 60:7-23, 71:3-9, 71:13-23).  Given these concessions, the alleged incidents do not demonstrate a workplace replete "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] [] employment and create an abusive working environment." *Williams*, 187 F.3d at 560 (internal quotation marks omitted) (citation omitted).  Childers' testimony recounts only two primary events that occurred three months apart, with the later incident occurring two months before Childers' evaluation.  Moreover, Childers' conduct demonstrates that Defendants' alleged actions did not unreasonably interfere with her work performance.  *See Wyatt*, 999 F.3d at

16

441.   As such, Childers cannot demonstrate a prima facie case of hostile work environment. Accordingly, Defendants' motion for summary judgment must be granted as to this claim, and Childers' motion for partial summary judgment will be denied.

**B.   Outrageous Conduct**

Kentucky law recognizes the tort claim of outrage, otherwise known as intentional infliction of emotional distress. *Brewer v. Hillard*, 15 S.W.3d 1, 6 (Ky. App. 1999) (citing *Craft v. Rice*, 671 S.W.2d 247, 250-51 (Ky. 1984)).   To prevail on this claim, a plaintiff must demonstrate "that defendant's conduct was intentional or reckless, that the conduct was so outrageous and intolerable so as to offend generally accepted standards of morality and decency, that a causal connection exists between the conduct complained of and the distress suffered, and that the resulting emotional stress was severe." *Id.* (citing *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990)).   Moreover, Kentucky courts have reiterated that such a claim "is not available for 'petty insults, unkind words and minor indignities.'  Nor is it to compensate for behavior that is 'cold, callous and lacking sensitivity.'"   *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000) (quoting *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996); *Humana*, 796 S.W.2d at 4). "Rather, it is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Id.* (citing *Kroger Co.*, 920, S.W.2d at 67).

Considering the events recounted above, Childers does not demonstrate that Defendants' conduct was so outrageous and pervasive to defy and offend the societal standards of morality and decency.   Defendants' conduct, if accepted as alleged, could be akin to callous conduct that may be considered uncouth but not actionable for a claim of outrage. *See Osborne*, 31 S.W.3d at 914. At no point was Childers so immobilized or overwhelmed by Defendants' purported condut to be "brought to her knees;" instead, she actively defied any alleged requests that she believed would

17

limit her accommodations.  (Childers Dep. 39:2-6, 45:17-19, 46:10-12, 47:7-25, 51:18-25).  Thus, Childers' outrage claim fails.  Accordingly, Defendants' motion for summary judgment on this claim will be granted, and Childers' corresponding motion will be denied.

### C.   <u>Gross Negligence</u>

Finally, Childers addresses her claim of gross negligence only regarding the availability of punitive damages.  (*See* Pl.'s Mem. 10-11; Pl.'s Resp. Defs.' Mot. Summ. J. 8-9); *see also M.T. v. Saum*, 3 F. Supp. 3d 617, 624 (W.D. Ky. 2014) ("In Kentucky, 'the well established common law standard for awarding punitive damages was [and is] gross negligence.'"  (alteration in original) (citation omitted)).  However, punitive damages are unavailable for her asserted claims.  *See Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 138-40 (Ky. 2003) (concluding that KRS 344.450 does not authorize the recovery of punitive damages under the KCRA); *accord Childers Oil Co. v. Adkins*, 256 S.W.3d 19, 27 (Ky. 2008); *cf. Barnes v. Gorman*, 536 U.S. 181, 185, 189 (2002) (noting that "the Court has interpreted Title IX consistently with Title VI" before concluding that "punitive damages may not be awarded in private suits brought under" Spending Clause legislation, such as Title VI and Title IX.  (citation omitted)); *Mathis v. Wayne Cnty. Bd. of Educ.*, No. 1:09-0034, 2011 U.S. Dist. LEXIS 59646, at *1-2 (M.D. Tenn. June 2, 2011) (collecting cases).  Thus, even if one of Childers' claims survived summary judgment, the relief she sought under this claim would still be unavailable.

Therefore, Childers' motion for partial summary judgment is denied, and Defendants' motion for summary judgment is granted on all claims.  Childers has not demonstrated pretext with regard to Defendants' legitimate basis for her non-renewal and termination to prevail on claims of discrimination and retaliation; has not established a prima facie case for hostile work environment; has not demonstrated that Defendants' conduct was so outrageous and intolerable to

establish a claim for outrage or intentional infliction of emotional distress; and cannot recover punitive damages under Title IX or the KCRA.

**V.**    <u>**CONCLUSION**</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 18) is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment (DN 19) is **DENIED**.  Plaintiffs' claims are **DISMISSED WITH PREJUDICE**, and the Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

July 19, 2023

cc:     counsel of record